# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| DAMON ELLIOTT and | : | |
| PIPTASTIC LIMITED, | : | JURY TRIAL |
| | : | DEMANDED |
| Defendants, | : | |
| | : | |
| DSE RETAIL LIMITED | : | |
| PAUL ROSE | : | |
| UNIQUE ASSET MANAGEMENT LIMITED | : | |
| and | : | |
| SHARON ELLIOTT, | : | |
| | : | |
| Relief Defendants. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Damon Elliott ("Elliott") and Piptastic Limited ("Piptastic") (collectively, the "Defendants"); and relief defendants DSE Retail Limited ("DSE Retail"), Paul Rose ("Rose"), Unique Asset Management Limited ("Unique Asset Management"), and Sharon Elliott (collectively, the "Relief Defendants"), and hereby demands a jury trial.

## SUMMARY

1.     This is a securities fraud enforcement action. Starting no later than January 2016 and continuing through at least May 2019, Elliott, operating through Piptastic, fraudulently raised at least $9 million from at least 80 investors, including at least approximately $5.3 million

from at least 30 investors in the United States. Elliott falsely represented to investors that he would use their money to engage in a type of speculative trading that the Defendants described as "spread trading" or "Spreadbet trading" (collectively referred to herein as "spread trading"), which refers to speculating on whether the price of a financial instrument—such as a security; or a commodity, such as a currency—will go up or down, and by how much, without actually owning the underlying security or commodity.

2.      Holding himself out as an expert in spread trading, Elliott led investors to believe that he was generating large returns for the investors. In actuality, Elliott's spread trading claims were a sham. Elliott did not use the investors' money for spread trading, and the information provided to investors about their purported profits was fabricated.

3.      Elliott misappropriated investor assets to pay principal and profits to investors in order to keep up the charade of a profitable venture, and pocketed a large share of the investors' money for the benefit of himself, his family (including his wife, Relief Defendant Sharon Elliott), and others (including his associate, Relief Defendant Paul Rose).

4.      Elliott lulled, and continues to lull, Piptastic's investors into a false sense of security about the status of their money by, among other things, falsely promising them that their money is safe and providing them with fictitious account statements that purport to reflect large amounts of money in spread trading accounts. In actuality, the accounts are essentially empty because Elliott has misappropriated the investors' money.

5.      As a result of the conduct alleged herein, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b) and §78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 340.10b-5].

6. The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and such other relief as the Court may deem appropriate. The Commission also seeks to permanently enjoin Elliott from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Elliott, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer. And, as to the Relief Defendants, the Commission seeks an order requiring the Relief Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint.

## JURISDICTION

7. The court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d), 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

8. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Among other things, at least one victim resides in this District.

## THE DEFENDANTS

9.      **Piptastic Limited**, is a corporation based in London, England operating as Piptastic Investments and/or Piptastic Trading (collectively referred to herein as "Piptastic"). At all times relevant to this Complaint, Damon Elliott was Piptastic's director. At times, Elliott referred to Piptastic as "Piptastic Trading" in investor agreements.

10.     **Damon Elliott**, age 48, is a United Kingdom citizen and, on information and belief, resides in France. At all times relevant to this Complaint, Elliott was Piptastic's director and held himself out to investors as Piptastic's investment "fund manager." Elliott represented to one or more investors that he is proficient at spread trading.

## RELIEF DEFENDANTS

11.     **DSE Retail Limited** is a corporation based in London, England with a stated business purpose of "other publishing activities." Elliott is DSE Retail's sole director.

12.     **Paul Rose**, age 54, is a United Kingdom citizen. At all times relevant to this Complaint, Rose held himself out as Piptastic's investment "fund administrator."

13.     **Unique Asset Management Limited** is a corporation based in East Sussex, England with a stated business purpose of "management consultancy activities other than financial management." Rose is the sole director of Unique Asset Management.

14.     **Sharon Elliott**, age 47, is a United Kingdom citizen and, on information and belief, resides in France. Sharon Elliott is and was married to Damon Elliott at all times relevant to this Complaint. From January 2016 through June 9, 2018, Sharon Elliott was identified on Piptastic's publicly filed incorporation documents as Piptastic's Secretary.

**FACT ALLEGATIONS**

A.    THE DEFENDANTS OFFERED AND SOLD SECURITIES.

15.    Starting no later than January 2016 and continuing through at least May 2019 (the "Solicitation Period"), Elliott directly or indirectly (including by operating through Piptastic and working with other individuals, including Rose, who acted as "finders" to identify and solicit potential investors) solicited and obtained more than $9 million from investors, including investors located in the United States and, in particular, Massachusetts.

16.    During the Solicitation Period, Elliott, directly and through finders, represented to investors that (a) Piptastic would pool the investors' money into one or more investment funds, and (b) Elliott would make money for investors based on his supposed spread trading expertise.

17.    For example, Elliott, directly and through finders, instructed investors to wire their money into a pooled bank account at a financial institution in the United Kingdom held in the name of Piptastic ("the Pooled Piptastic Investor Bank Account"). Rose directed various investors he dealt with to send their money to a separately pooled bank account that he controlled at another financial institution in the United Kingdom; in turn, Rose transferred investor funds from the account Rose controlled to the Pooled Piptastic Investor Bank Account.

18.    Elliott provided written investment agreements to a finder referred to herein as Finder A—who invested his own money as well as the money of other individuals whom the finder introduced to the Defendants (referred to herein as "Finder A's Investor Group")—which expressly referred to the Piptastic investment vehicle as a "fund." Rose, when communicating with at least one investor, referred to the Piptastic investment vehicle as a "fund."

5

19. The Defendants, therefore, offered and sold investment contracts (i.e., investment funds), a type of security. Further, the Defendants claimed that they engaged in spread trading, which would qualify as a securities-based swap had the Defendants actually engaged in spread trading in underlying securities, such as securities traded in the United States markets. For example, at least one Piptastic investor agreement stated that the "[o]bjective" of the fund was "[t]o take advantage of market movements within the FX, European and **US Indices** . . . ." (emphasis added).

### B. THE DEFENDANTS MADE FALSE REPRESENTATIONS TO INVESTORS AND MISAPPROPRIATED INVESTOR MONEY.

20. During the Solicitation Period, the Defendants directly, as well as through Rose and Finder A, falsely represented, in oral solicitations and in written agreements, that Elliott would use investors' money to engage in spread trading.

21. For example, the Defendants falsely represented the following in investment agreements that they provided to Finder A and at least one other investor:

> "Objective [of the] fund": "[t]o take advantage of market movements within the FX [foreign currency], European and US Indices and commodities to provide income and growth for investors within the fund. The Fund Manager, thru [sic] intra-day trading will actively participate in managing trading the [sic] aforementioned markets, with the objective of compounding the fund, through leverage, to deliver profits to investors . . . ."

22. The "fund" referred to in the investment agreements was the Piptastic investment vehicle described above ("the Fund"), and at all times relevant to this Complaint, Elliott was the Fund Manager.

23. During the Solicitation Period, the Defendants falsely represented that any distributions from the Fund would be prioritized in such a way that Elliott and Rose would only make money if investors profited first. For example, the Defendants represented the following:

6

"Returns[:] . . . "The Fund Manager is fully confident in achieving the objective of a 10-point positive movement per day, and has been consistently achieving this for other client accounts. The Fund Manager and the Fund Administrator have agreed that a 5% hurdle rate must be achieved before any management/administration charges are allocated. . . . **There are no front-end fees or commissions paid out of investor funds to the Fund Manager or Administrator.**" (Emphasis added).

24. At all times relevant to this Complaint, Rose was the Fund Administrator.

25. The Defendants made variations of the same representations about only taking money (and Rose only taking money) if investors first profited in, for example, investment agreements signed by Elliott and provided to Finder A during the Solicitation Period.

26. The Defendants repeatedly represented that investors' money was protected by various safeguards. For example, on or about August 16, 2017 and August 30, 2018, Elliott signed an agreement with Finder A, which provided:

> Although it is virtually impossible to 'guarantee' anything in this world, the Fund Manager [Elliott] has agreed that should the fund fall 10% below the opening balance, the Managers [sic] funds will be used in trade [sic] until such time the fund is back to the opening balance. In short, if the fund goes below the first day opening balance by 10%, trading will cease and the Fund Manager will notify investors of the fund balances, at which point investors may decide to remain in trade [sic], or remove their funds from trade [sic] and redeem at a loss.

27. In actuality, the Defendants' representations about the use of investors' money and about various safeguards were false. Elliott, who had sole signatory authority over the Pooled Piptastic Investor Bank Account, did not use any substantial portion of the investors' money for spread trading; nor did he prioritize profits to investors ahead of fees or commissions to himself or finders; and there were, in reality, no safeguard procedures of the kind set forth in Piptastic's investment agreements to minimize losses. Instead:

   a. Elliott opened (or already had opened) three spread trading accounts at United Kingdom-based companies (referred to herein as Trading Platform A and Trading Platform B) that offered spread trading account access, two of which

7

Elliott never funded with investor money and the other of which Elliott only funded with approximately 5,600 British Pounds (£) since January 2016; and

b. Instead of using investor funds to engage in spread trading as he had represented to investors, Elliott misappropriated investor money by transferring it from the Pooled Piptastic Investor Bank Account—which was supposed to be used to fund trading accounts pursuant to the terms of investor agreements—to himself and an additional entity that he controlled (Relief Defendant DSE Retail), his wife (Relief Defendant Sharon Elliott), Relief Defendant Paul Rose and an entity controlled by Rose (Relief Defendant Unique Asset Management), and other third parties. The following table illustrates at least $6.9 million of Elliott's fraudulent transfers:

| Individual/Entity | Amount Transferred from the Piptastic Bank Account |
|---|---|
| Unique Asset Management | $2,781,531 |
| DSE Retail | $2,279,030 |
| Paul Rose | $1,208,395 |
| Sharon Elliott | $618,670 |
| Damon Elliott | $58,591 |
| Relative of Elliott | $39,000 |
| **Total** | **$6,985,217** |

*Currency: USD (converted from GBP at the prevailing exchange rate; subject to exchange rate fluctuations)*

28.   Elliott, Rose, Elliott's relatives (i.e., Sharon Elliott and the person identified herein as Relative #1), Unique Asset Management, and DSE Retail did not have any legitimate right to these investor funds, which were solicited on the basis of false and fraudulent pretenses, representations and promises. The Defendants and Relief Defendants did not provide bona fide goods or services in exchange for these investor funds. By the terms of the investment agreements provided to various investors, no funds were owed to Elliott, Rose, or anyone else

8

other than the investors because, among other reasons, the Defendants did not make profitable trades from which the Defendants or any of their agents, associates, or family members were entitled to any fees, commissions or other distributions.

29.     To make it seem like Elliott was entitled to pay himself with investor funds and engaged in spread trading as he had promised, starting no later than August 2018 and continuing through at least January 2020, Elliott provided fabricated documents to investors, including Finder A, that falsely appeared to be account statements produced by Trading Platform A and/or Trading Platform B.

30.     For example, on or about January 24, 2020, Elliott provided Finder A with fabricated account statements that falsely reflected funds on deposit at Trading Platform A and Trading Platform B—and supposedly held for the benefit of Finder A's Investor Group—of greater than £8 million. These balances were fake.

31.     Further, at various times between 2016 and 2019, Elliott repaid principal investments and paid purported spread trading profits to investors. Elliott's distribution of money sustained the charade that he was actively, and profitably, using investors' money for spread trading. In actuality, Elliott used new investor money to make Ponzi-like payments to previous investors.

32.     By means of these fabricated account statements and other false representations, Elliott created—and continues to create—the impression that he had used investor money for spread trading.

## C.   THE DEFENDANTS CREATED FALSE ACCOUNT STATEMENTS AND MADE LULLING STATEMENTS IN FURTHERANCE OF THE FRAUD.

33.     During at least 2019 through the present, one or more investors unsuccessfully tried to redeem their money from Piptastic, not realizing that their money had been misappropriated by Elliott.

34.     Elliott, knowing that he misappropriated investors' funds and made false and misleading statements about how he would use those funds, took steps to cover up his fraud. In particular, Elliott has lulled—and continues to lull—investors into a false sense of security by lying about the status of their investments, perpetuating the illusion that Elliott has conducted spread trading on behalf the investors; that such spread trading has been highly profitable; and that the investors' funds, as well as substantial profits, are safely held in trading accounts for the benefit of the investors.

35.     For example, Elliott directly and/or through various finders—who passed on information they learned from Elliott—falsely represented to one or more investors that their money is safely held in trading accounts at well-known spread trading companies based in the United Kingdom (Trading Platform A and Trading Platform B). In particular, in or about February 2020, Elliott told Rose, in substance, that Elliott was still trading in the Trading Platform B account and that the account was growing as a result of Elliott's profitable trades.

36.     On the other hand, in or about February 2020, Elliott told Rose, in substance, that Elliott was unable to withdraw funds to pay investors from the same Trading Platform B account that Elliott was supposedly still trading on investors' behalf. And, Elliott directly and/or through various finders like Rose—who passed on information they learned from Elliott—have falsely represented to one or more investors that Piptastic is unable to redeem their funds because

10

of an account freeze of some kind, which Elliott and the finders have attributed to governmental or regulatory activity.

37. For example, on or about March 13, 2020, Elliott sent Finder A an email in which Elliott told Finder A, in substance, that Elliott had recently (i.e., in or about March 2020) temporarily stopped trading and could not return any funds because he was in the process of working with counsel to deal with regulatory issues. In that March 13, 2020 email, Elliott said that "[t]he goal remains to untangle whatever confusion is occuring [sic] with the platforms, and any regulatory body, and then to get the funds liquid again." But, as Elliott knew, he misappropriated the "funds," which is why he is unable to repay investors, like Finder A or Finder A's Investor group.

38. In fact, Elliott had opened just one account at Trading Platform A, it was never funded, and was closed in or about June 2019. Elliott only funded one of the Trading Platform B spread trading accounts with approximately £5,600 since January 2016. The balance of that account as of April 2020 was just approximately £25. Although Elliott did, as of April 2020, have a second open and funded account with Trading Platform B, it (a) is not a spread trading account; and (b) only had a balance of approximately 8 Euros.

39. Further, the Trading Platform A and B accounts have not been frozen by a regulatory or governmental body despite Elliott's contrary representations, directly or through finders, to investors.

40. In furtherance of lulling investors into a false sense of security about their money, Elliott provided Finder A with fabricated account statements that were dressed up to look like the statements routinely produced by Trading Platform A and/or Trading Platform B from at least August 2018 through January 2020.

11

41. For example, on or about January 24, 2020, Elliott sent an email to Finder A in which Elliott included images of several supposed current account statements held at Trading Platform A, and a supposed account statement held at Trading Platform B, which supposedly were held on behalf of Finder A's Investor Group. These account statements provided by Elliott reflected an aggregate balance greater than £8 million at Trading Platform A and approximately £182,000 at Trading Platform B. As of January 2020, however, neither Piptastic nor Elliott actually had these accounts opened at Trading Platform A, and the only accounts opened at Trading Platform B associated with the Defendants' purported spread trading operation had a balance of approximately £25.

42. Similarly, Elliott falsely represented, directly or through various finders, to various investors that the investors' money and supposed profits were still preserved. In actuality, the balance of the Pooled Piptastic Investor Bank Account was less than £2 as of March 2020 and, as set forth above, the balance of spread trading accounts that Elliott held at either Trading Platform A or Trading Platform B had an aggregate balance of approximately £25 as of April 2020.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
(Violation of Section 17(a) of the Securities Act)

43. The Commission repeats and incorporates by reference the allegations in paragraphs 1 – 42 above as set forth fully herein.

44. The Defendants, either directly or indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are

obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

45.     As a result, the Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

46.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 – 42 above as set forth fully herein.

47.     The Defendants, either directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

48.     As a result, the Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### OTHER EQUITABLE RELIEF, INCLUDING UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

49. Paragraphs 1 - 42 above are re-alleged and incorporated by reference as if fully set forth herein.

50. Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states "[i]n any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

51. The Relief Defendants have received investor funds derived from the unlawful acts, practices and scheme of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

52. Further, specific property acquired by the Relief Defendants is traceable to Defendants' wrongful acts, and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

53. As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on property in the possession of the Relief Defendants that is traceable to the Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating

Section 17(a) of the Securities Act [15 U.S.C. §§ 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

    B.    Permanently enjoin Elliott from, directly or indirectly, including, but not limited to, through any entity owned or controlled by Elliott, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer.

    C.    Order the Defendants to disgorge on a joint and several basis, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, and order the Relief Defendants to disgorge on a joint and several basis with Piptastic Limited and Damon Elliott, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

    D.    Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

    E.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

    F.    Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

DATED this 6th day of May 2020.

                                          Respectfully submitted,

                                          /s/ Eric A. Forni
                                          Eric A. Forni (Mass. Bar No. 669685)
                                               Senior Trial Counsel
                                          Ellen B. Moynihan (Mass. Bar No. 567598)
                                               Senior Investigations Counsel
                                          Martin F. Healey (Mass. Bar No. 227550)
                                             Regional Trial Counsel
                                          SECURITIES AND EXCHANGE COMMISSION
                                          Boston Regional Office
                                          33 Arch St., 24th Floor
                                          Boston, MA 02110
                                          Phone: (617) 573-8827 (Forni direct)
                                          Fax: (617) 573-4590 (fax)
                                          ForniE@sec.gov (Forni email)