UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 20-cv-10860-LTS |
| | : | |
| DAMON ELLIOTT and | : | |
| PIPTASTIC LIMITED, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| DSE RETAIL LIMITED | : | |
| PAUL ROSE | : | |
| UNIQUE ASSET MANAGEMENT LIMITED | : | |
| and | : | |
| SHARON ELLIOTT, | : | |
| | : | |
| Relief Defendants. | : | |

MEMORANDUM IN SUPPORT OF THE COMMISSION'S
MOTION FOR REMEDIES AS TO DAMON ELLIOTT

The Securities and Exchange Commission ("Commission" or "SEC") respectfully

submits this memorandum of law, and supporting declaration of Mark Albers ("Albers Dec."), in

support of its motion for remedies as to Damon Elliott.  See Dkt. No. 67.  For the reasons set

forth below, the Commission requests that the Court order Elliott to pay disgorgement of

$5,492,059 in ill-gotten gains, plus $856,255 of prejudgment interesting ("PJI"), and order Elliott

to pay a significant penalty commensurate with the statutory framework of the Securities Act of

1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act").

**PROCEDURAL HISTORY**

The Commission charged Elliott with engaging in fraud.  As alleged in the Complaint,

Elliott, operating through Piptastic Limited ("Piptastic"), (collectively, "Defendants") defrauded

at least 80 investors who had invested at least $9 million with Piptastic.  Defendants represented

that Elliott would use their money for "spread trading," a form of market arbitrage in which the

investor bets on the direction a market will move.  Complaint, ¶ 1.  In actuality, Elliott

misappropriated the investors' money directly and through Piptastic and another entity, relief

defendant DSE Retail Limited ("DSE").  He perpetuated the fraud by repeatedly lying to

investors and by creating and sending fake account statements that made it seem like the

investors' money was not just safe, but growing in value.  Id., ¶¶ 2, 3.  As a result of this

conduct, the Commission charged Elliott with fraud in violation of Section 17(a) of the

Securities Act [15 U.S.C. § 77(q)(a)] and Section 10(b) of the Exchange Act and Rule 10b-5

thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

On September 15, 2021, the Court entered a partial judgment against Elliott pursuant to

which the Court enjoined Elliott from future violations of Section 17(a) of the Securities Act and

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Dkt. No. 65 (the "Judgment").

Further, the Court ordered that "Defendant shall pay disgorgement of ill-gotten gains, plus

prejudgement interest thereon, and a civil penalty . . . [and] [t]he Court shall determine the

amounts of the disgorgement and civil penalty upon motion of the Commission."  Dkt. No. 65, at

4.  The Court further odered that, in connection wth this motion and any hearing held on such

motion, "Defendant shall be precluded from arguing that he did not violate the federal securities

laws as alleged in the Complaint . . . [and] the allegations of the Complaint shall be accepted as

and deemed true by the Court." Id.  These allegations, which must now be accepted and deemed true, are set forth below.

## FACTS

Elliott and Piptastic claimed to investors that they were going to use investor money for "spread trading," a way of speculating on whether the price of a security will go up or down, and by how much, without owning the underlying security or commodity.  Complaint ¶ 1.  Directly and through Piptastic and others, Elliott solicited and obtained more than $9 million from investors, including Massachusetts investors, for supposed use in his spread trading scheme.  Id. ¶¶ 15, 16.  Elliott claimed to be a spread-trading expert, lulling investors with promises of financial security and fake account statements, while taking their money and using it for his own purposes.  Id. passim.  At Elliott's direction, investors wired money to a pooled bank account in the United Kingdom held in the name of Piptastic.  Id. ¶ 17.  The supposed investment, which Elliott and at least one person who solicited investors for him (a "finder") called a "fund," was an investment contract, a type of security.  Id. ¶¶ 18-19, 21-22.  As a second, independent jurisdictional basis, the defendants' claims that they were investing in spread-trading securities also rendered the supposed investment a security.  Id. ¶ 19.

To reassure their victims, Elliott (through Piptastic and others) repeatedly made claims about his and his associates' investment prowess and promised that Elliott and his associates would make money only if they provided returns for their investors.  Id. ¶¶ 23, 25.  Further lulling investors, Elliott and Piptastic repeatedly claimed that investors' money was protected and that if the fund balance dropped by a certain amount, Elliott's own funds would be used to trade until the fund was back to its earlier value.  Id. ¶ 26.

These claims were lies.  Elliott, who had signatory authority over the Piptastic account that held investor fund, did not use any substantial portion of the investors' money for spread trading, nor prioritize profits to investors ahead of fees or commissions for himself and his finders, and there were no safeguards like the ones he described.  Id. ¶ 27.  Instead, the spread-trading accounts Elliott opened remained unfunded or barely funded, and Elliott took investors' money from the Piptastic trading account and transferred it to himself, DSE, other relief defendants, and others.  Id.  Neither Elliott nor Piptastic nor the other people who received these investor moneys had a legitimate right to them.  Elliott and his finders solicited the money under false pretenses and provided no bona fide goods or services in exchange for the money.  Id. ¶ 28. To support his baseless claims to this money, Elliott gave investors fabricated documents that were represented to be account statements from their trading accounts.  Id. ¶¶ 29-30, 40-41.  The balances reflected on at these statements were fake.  Id. ¶ 30.

In addition to deceiving investors with false account statements, Elliott represented to his finders and intermediaries that investor funds were secure and available, when he had already diverted the money to his own and the relief defendants' uses.  Id. ¶¶ 35-38.  To further the charade, Elliott also made Ponzi-like payments to earlier investors, using later investors' funds to give the false impression that he was engaging in successful trading in their accounts.  Id. ¶¶ 31-32.  Elliott lulled investors who asked for their money back by falsely representing that their money was safely held in trading accounts at well-known spread trading companies based in the United Kingdom, and that at least one such account was growing because of Elliott's profitable trades.  Id. ¶ 35.  Asked by investors to redeem (withdraw) their funds, Elliott—directly or through others—falsely represented that he could not do so because of an account freeze of some kind, purportedly based on governmental or regulatory activity.  Id. ¶ 36.  And he claimed to

Paul Rose, a relief defendant, that he was unable to withdraw funds from the supposedly-successful spread trading account.  Id.  In reality, Elliott did not use any substantial portion of the investors' money for spread trading.  Id. ¶ 27.  Instead, he misappropriated the funds.

**REMEDIES**

**I.       Disgorgement Plus Prejudgment Interest**

        **A.       Legal Standard**

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989); SEC v. Williams, 884 F. Supp. 28, 30 (D. Mass. 1995) (disgorgement is intended to deprive defendants of their "ill-gotten gains").  It has long been recognized that the "deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." Manor Nursing Ctrs., 458 F.2d at 104; see also SEC v. Druffner, 517 F. Supp. 2d 502, 511 (D. Mass. 2007).

On June 22, 2020, the Supreme Court issued an opinion in SEC v. Liu, which provided guidance on district courts' authority to issue disgorgement orders in Commission cases.  The Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] §78u(d)(5) [Section 21(d)(5) of the Securities Exchange Act]." SEC v. Liu, 140 S. Ct. 1940 (2020).  Further, Liu made clear that joint-and-several liability can be imposed "for partners engaged in concerted wrongdoing." Liu, 140 S. Ct. at 1949.  Joint-and-several liability is appropriate where the misconduct precludes clear apportionment, such as in this case where the crux of the scheme was using various nominee accounts designed to obfuscate the true traders and beneficial owners of the underlying securities.  Indeed, Liu cites with approval (id.) the case of SEC v. Hughes, 124

5

F.3d 449, 455-56 (3d Cir. 1997), where the court affirmed a joint-and-several award because the defendant did not contradict the "substantial evidence" offered by the SEC showing that she "benefitted substantially" from violations committed by the scheme of which she was a part. The Supreme Court has previously made clear that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946).

Further, Section 20(a) of the Exchange Act provides that "any person who, directly or indirectly, controls any person . . .  shall . . . be liable jointly and severally with and to the same extent as such controlled person."  Accordingly, the Commission can seek joint-and-several liability of control persons even though the ill-gotten gains could be apportioned between the control person and controlled persons.  See, e.g., SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1475-76 (2d Cir. 1996) (defendant held liable with corporate entity of which he was the sole owner and which he controlled).  This scenario is applicable here, where Elliott controlled Piptastic and DSE.

Following the Supreme Court's decision in Liu, Congress passed the National Defense Authorization Act of 2021, which amended the Exchange Act to expressly authorize the Commission to seek disgorgement in a manner that incorporates the equitable principles set forth in Liu regarding, among other things, joint and several liability.  See Section 21(d)(7) of the Exchange Act.

### B.    Elliott was Unjustly Enriched

Elliott unjustly received approximately $2.1 million[1] in proceeds derived from various entities (*i.e.*, defendant Piptastic, and relief defendants DSE and Unique Asset Management) that

---

[1] All currency amounts reflected herein account for an exchange rate conversion.  See Albers Dec., ¶9.

received investor money throughout the course of the fraudulent scheme.  See Albers Dec.,

¶¶11(D), 12.  Elliott admitted during this deposition that "I borrowed – I – I really can't tell

[you] a specific figure, but it's – it's a case of, you know, I had – stupidly, I borrowed money

from the Piptastic accounts . . . [and] I stupidly borrowed, and that's, you know, I mean, at the

end of the day once this is all said and done that's got ot be paid back, and that was always my

intention."  See Excerpts of Damon Elliott's Deposition, attached hereto as Exhibit A, at 91-92.

But, Elliott has not paid the money back to investors.  Instead, Elliott "borrow[ed]" investor

money to purchase his house in France, which is not mortgaged.  See id.  Moreover, Elliott

admitted that he "borrowed" (*i.e.*, misappropriated) investor money that was not derived from

any trading profit.  See id.  Meaning, Elliott misappropriated investment principal to which he

had no rightful claim.  See id.  The Court should order Elliott to return all of that money, plus

interest.

Further, Elliott should be ordered to pay, on a joint-and-several-basis, the disgorgement

attributable to Piptastic of approximately $5.3 million.[2]  Albers Dec., ¶¶11(A), 12.  Elliott had

signatory authority over Piptastic's bank account.  Id., ¶5.  Elliott was Piptastic's sole director.

Id.  Elliott, therefore, is responsible for Piptastic's conduct and ill-gotten gains.  See, e.g., First

Jersey Secs., Inc., 101 F.3d at 1475-76 (defendant held liable with corporate entity of which he

was the sole owner and which he controlled).

---

[2] The approximately $2.1 million that Elliott received directly, summarized above, is comprised of approximately
$1.9 million received from Piptastic directly or indirectly, *i.e.*, through his entity DSE (which received money from
Piptastic), and another approximately $200k received from a source other than Piptastic.  Albers Dec., ¶¶8, 11, 12.
Therefore, as the proposed form of judgment attached to the motion for remedies reflects, if the Court orders Elliott
to pay approximately $5.3 million on a joint-and-several basis with Piptastic, the Commission asks that the Court
also order Elliott to pay an additional approximately $200k individually because this amount is not included in the
$5.3 million figure attributable to Piptastic.

Similarly, Elliott is jointly-and-severally liable for DSE's disgorgement of approximately

$2.4 million.[3]  Albers Dec., ¶¶11(B), 12; Dkt. Nos. 59 and 60 (ordering DSE and Piptastic to pay

disgorgement of $2,424,630 on a joint-and-several basis).[4]

Finally, Elliott is jointly-and-severally liable with Sharon Elliott for the amount of funds

directed to their joint personal bank accounts, which cannot be apprortioned beween them.

Albers Dec., ¶¶11(C), 12; Exhibit A, at 97-99 (Elliott testifying about his joint accounts with

Sharon Elliott).[5]

The Commission also seeks prejudgment interest.  "Courts have recognized that an

assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive

wrongdoers of profits they illegally obtained by violating the securities laws."  Sargent, 329 F.3d

34, 40 (1st Cir. 2003) (internal citations omitted); Druffner, 517 F. Supp. 2d at 512 (noting that

the "First Circuit endorses the award of prejudgment interest in securities violations" and

awarding it "to prevent the defendant from receiving the benefit of what would otherwise be an

interest-free loan").  The Court has broad discretion whether to grant prejudgment interest and

what rate to use for calculation.  See First Jersey Sec., Inc., 101 F.3d at 1476-77 (using IRS

underpayment rate); SEC v. Locke Capital Mgmt., Inc., 794 F. Supp. 2d 355, 369 (D.R.I. 2011);

17 C.F.R. §201.600(b) (Commission Rules of Practice state that prejudgment interest is

---

[3] If the Court orders Elliott to pay, on a joint-and-several basis, approximately $5.3 million with Pipatsic, that would subsume the approximately $2.4 million attributed to DSE.

[4] As noted in the Commission's motion for remedies, the Commission inadvertently added DSE's disgorgement amount to Piptastic's disgorgement amount (yielding a total of appoximately $7.7 million) when preparing the proposed order in connection with the default judgment proceedings as to DSE and Piptastic.  In the process of preparing these papers, the Commission realized that the approximately $2.4 million in disgorgement attributable to DSE should be included in—not added to—the approximately $5.3 million disgorgement attributable to Piptastic. Further, the disgorgement amount attributable to DSE referenced here and in the Albers Dec. is £16,000 less than the amount included in Albers declaration dated November 5, 2020 and in the Final Judgment with respect to DSE as a result of new information analyzed after the filing of Albers' prior declaration.

[5] The staff has yet to file a consent and final judgment as to Sharon Elliott reflecting such joint and several liability, but plans to do so before the briefing schedule with respect to Elliott has concluded.

computed at IRS underpayment rate, compounded quarterly).  Prejudgment interest is calculated

for the entire period from the time of the defendants' unlawful gains to the entry of judgment.

See First Jersey, 101 F.3d at 1477.

The Commission proposes the use of the IRS underpayment rate, compounded quarterly,

and has computed prejudgment interest using this method.  The prejudgment interest on Elliott's

joint-and-several net profits for each year was calculated separately, assuming (favorably to

Elliott) that all of the profits were received on the last day of the year in which they were earned.

Albers Dec., ¶9.

In light of the foregoing, the total amount the Commission seeks in disgorgement from

Elliott is as follows:[6]

| Category | 2016 | 2017 | 2018 | 2019 | 2020 | Grand Total |
|---|---|---|---|---|---|---|
| **Elliott via Piptastic** | | | | | | |
| Disgorgement | $1,089,599.65 | $2,730,336.58 | $401,930.10 | $1,067,161.20 | $0.00 | $5,289,027.54 |
| PJI | $246,207.37 | $486,340.44 | $49,739.42 | $68,360.72 | $0.00 | $850,647.95 |
| Total Disgorgement and PJI via Piptastic | **$1,335,807.02** | **$3,216,677.02** | **$451,669.52** | **$1,135,521.92** | **$0.00** | **$6,139,675.49** |
| **Elliott via UAM** | | | | | | |
| Disgorgement | $0.00 | $0.00 | $0.00 | $24,541.65 | $178,490.00 | $203,031.65 |
| PJI | $0.00 | $0.00 | $0.00 | $1,572.10 | $4,035.05 | $5,607.15 |
| Total Disgorgement and PJI via UAM | **$0.00** | **$0.00** | **$0.00** | **$26,113.75** | **$182,525.05** | **$208,638.80** |
| | | | | | | |
| **GRAND TOTAL ELLIOTT DISGORGEMENT AND PJI** | **$1,335,807.02** | **$3,216,677.02** | **$451,669.52** | **$1,161,635.67** | **$182,525.05** | **$6,348,314.28** |

Albers Dec., ¶13.

## II.     Civil Penalties

The Commission respectfully requests that the Court impose maximum civil penalties

against Elliott.

---

[6] As noted above, the calculated disgorgement number for DSE is less now than the amount set forth in the Final Judgment entered by the Court as to DSE.  See Dkt. No. 59.  But, given the passage of time, the PJI calculated on the revised disgorgement number would now be higher ($313,499) if calculated through September 30, 2021, see Albers Dec., ¶12, than as calculated previously ($226,209, see Dkt. No. 59).  The Commission proposes using the $226,209 figure as a component of its proposed judgment—holding Elliott jointly and severally liable with DSE— because it is consistent with DSE's judgment and, despite being based on a higher principal, is actually lower given the earlier date on which it had been calculated.  Therefore, Elliott is not negatively affected by using the originally calculated DSE disgorgement number to arrive at a PJI calculation here.

A.      **The Civil Penalty Statutory Scheme**

Section 21(d)(3)(A) of the Exchange Act and Section 20(d)(1) of the Securities Act give

the Commission authority to seek civil penalties against violators of the securities laws.  See 15

U.S.C. §77t(d)(1); §78u(d)(3)(A).  In 1990, Congress determined that disgorgement alone is an

insufficient remedy, concluding that "[s]ince disgorgement merely requires the return of

wrongfully obtained profits, it does not impose any meaningful economic cost on the law

violator. . . . authority to seek or impose substantial money penalties, in addition to the

disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise

would provide great financial returns to the violator."  S. Rep. 101-337 (1990), reprinted in 1990

WL 263550 (Leg. Hist.).

Under both the Securities Act and the Exchange Act, courts can impose penalties in civil

injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a

result of a violation, or (ii) a specified amount per violation, depending on whether the violation

falls in the "first tier," "second tier" or "third tier."  *See* 15 U.S.C. §77t(d)((2); 15 U.S.C.

§78u(d)(3)(B); see also Locke Capital, 794 F. Supp. 2d at 370 (describing three-tier penalty

scheme).  As applied to Elliott's violations, the maximum first-tier penalty amount is $9,753 per

violation, the maximum second-tier penalty is $97,523 per violation, and the maximum third-tier

penalty amount for a natural person that engaged in "fraud, deceit, manipulation or deliberate or

reckless disregard of a regulatory requirement," where the violation directly or indirectly results

in substantial losses or creates a significant risk of substantial losses to other persons, is

$195,047 per violation.  See 15 U.S.C. §77t(d)((2); 15 U.S.C. §78u(d)(3)(B); 17 C.F.R.

§201.1001(b).[7]  Unlike disgorgement, civil penalties may not be ordered jointly and severally

---

[7] Though the statutes contain lower penalty amounts for each of the tiers, these amounts were increased for

and should be ordered separately against each defendant.  See SEC v. Pentagon Capital Mgmt.
PLC, 725 F.3d 279, 288 (2d Cir. 2013).

Although the statutes provide maximum penalties "for each such violation," neither the
Securities Act nor the Exchange Act prescribes how to calculate the number of violations.
Several courts have determined that a "violation" encompasses each instance that a defendant
has acted to violate the securities laws.  See, e.g., SEC v. Lazare Indus., Inc., 294 Fed. Appx.
711, 715 (3d Cir. 2008) (district court's imposition of $500,000 penalty was reasonable given
that it could have considered each sale of unregistered stock as a separate violation).  For
example, the Court may consider the number of statutes that were violated, or may consider the
number of victims to whom misrepresentations were made.  See, e.g., SEC v. Kenton Capital
Ltd., 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (imposing $1.2 million penalty calculated by
"multiplying the maximum third tier penalty" by the "number of investors who actually sent
money" to the defendant).  The Court may also simply impose a penalty in the amount of, or
based on, a defendant's gross pecuniary gain.  See Locke Capital, 794 F. Supp. 2d at 371; SEC v.
Gibraltar Global Securities, Inc., No. 13-civ-2575, 2016 WL 153090, *5-6 (S.D.N.Y. Jan. 12,
2016) (calculating each of two defendants' civil penalties as half of the total ill-gotten gains they
received from violations of Securities Act §5 and Exchange Act §15).

### B.      Civil Penalties Are Appropriate Here

Elliott should be penalized to make clear that the consequence of violating any of the
federal securities laws is significant.

---

violations occurring after November 2, 2015, to account for inflation.  *See* 17 C.F.R. §201.1001(b); Inflation
Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of
January 15, 2020), available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm.

As described above, Elliott committed a serious and intentional fraud.  Indeed, his conduct was egregious, repeated, and created a substantial loss or the risk of substantial loss to other persons.  See generally SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), aff'd sub nom SEC v. Kern, 425 F.3d 143 (2d Cir. 2005).

For the foregoing reasons, it is appropriate to impose the maximum available civil monetary penalty against Elliott, just as the Court did against Pipastic.  See Dtk. No. 60 (imposing $7,713,658 penalty against Pipastic).

## III.     There is No Reason For Delay under Federal Rule Civil Procedure 54(b)

The Court may direct entry of a final judgment as to one or more, but fewer than all, parties if the Court expressly determines that there is no reason for delay.  Fed. R. Civ. P. 54(b).  There is no just reason for delay in this case because the proposed final judgment as to Elliott would not prejudice the remaining relief defendants.  The remaining relief defendants may still litigate this case fully and/or seek dispositions in their own best interests.  And, if the Commission succeeds in recovering any funds, the entry of final judgments may enable the Commission to return funds to investors sooner than if the Court waits for a final disposition as to all parties.

The Court should, therefore, determine that "there is no just reason for delay" in entering the proposed final judgments against Elliott.

## CONCLUSION

For the reasons set forth and any additional adduced at argument or in further briefing, a

Final Judgment should enter Elliott.


SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Eric A. Forni
Eric A. Forni
    Senior Trial Counsel
Susan Cooke Anderson
    Senior Trial Counsel
Ellen B. Moynihan
    Senior Investigations Counsel
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
ForniE@sec.gov (Forni email)


Dated:  October 29, 2021

## Service

I, Eric A. Forni, certify that on October 29, 2021, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system and, accordingly, the document will be sent electronically to the registered participants as identified on the Notice of Electronic filing. In addition, any defendant/or relief defendant who are not registered participants will be promptly served by email addresses attributed to them.

/s/ Eric A. Forni
Eric A. Forni