UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DAMON ELLIOTT and PIPTASTIC LIMITED,<br><br>Defendants,<br><br>DSE RETAIL LIMITED, PAUL ROSE, UNIQUE ASSET MANAGEMENT LIMITED, and SHARON ELLIOTT<br><br>Relief Defendants. | Civil No. 20-10860-LTS |

ORDER ON MOTION FOR REMEDIES AS TO DAMON ELLIOTT AND TO AMEND
FINAL JUDGMENT AS TO PIPTASTIC LIMITED (DOC. NO. 67)

April 8, 2022

SOROKIN, J.

The Securities and Exchange Commission ("SEC") brought the present securities fraud enforcement action against Defendants Damon Elliott ("Elliott") and Piptastic Limited ("Piptastic") and Relief Defendants DSE Retail Limited ("DSE"), Paul Rose, Unique Asset Management Limited, and Sharon Elliott alleging violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"). See Doc. No. 1. The Court has since entered partial judgment against Elliott, which, inter alia, requires him to pay disgorgement of ill-gotten gains, prejudgment interest, and a civil penalty in an amount to be determined by the Court. Doc. No.

65. The parties have submitted briefing stating their positions on the proper remedies. After careful consideration of the parties' submissions, the Court orders Elliott to pay $5,492,059 in disgorgement, $856,255 in prejudgment interest, and a civil penalty of $97,523. In addition, the SEC's Motion to Amend the Final Judgment as to Piptastic is ALLOWED.

I.   PROCEDURAL HISTORY AND BACKGROUND

On May 6, 2020, the SEC filed a complaint against Elliott charging him with defrauding approximately 80 investors to the tune of $9 million. See Doc. No. 1. The SEC and Elliott agreed to the terms of a judgment whereby Elliott consented to the entry of judgment without admitting or denying the allegations of the complaint. Doc. No. 63. Pursuant to the parties' agreement, the Court entered partial judgment against Elliott on September 15, 2021. Doc. No. 65. The judgment enjoined Elliott from committing future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Exchange Act. Doc. No. 65 at 2-3. The judgment further ordered Elliott to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty in an amount to be determined by the Court upon a Motion by the SEC. Id. at 4. In connection with the Court's remedy determination, the judgment barred Elliott from "arguing that he did not violate the federal securities laws as alleged in the Complaint" and stated that the "allegations of the Complaint shall be accepted as and deemed true by the Court." Id. at 4. During a status conference on October 7, 2021, the Court set deadlines for remedy briefing by the parties. Doc. No. 66. The Court briefly recites the allegations set forth in the SEC's complaint, which, for the purposes of this Motion, the Court accepts as true.

Elliott, who operated through Piptastic as well as other individuals called "finders," obtained more than $9 million from investors between January 2016 and May 2019. Doc. No. 1

¶ 15. The Defendants promised investors that Piptastic would pool their money into investment funds that would be used for "spread trading."[1]  Id. ¶¶ 16, 20-21.  At all times relevant to the SEC's complaint, Elliott was Piptastic's director and had sole signatory authority over the pooled Piptastic investor bank account into which investors' money was transferred.  Id. ¶¶ 9-10, 27

To attract investments, the Defendants assured investors of Elliott's spread trading expertise, promised that Elliott and the finders would make money only if investors profited, and explained that investor funds were safeguarded against risk.  Id. ¶¶ 23-26.  These claims were false.  In reality, Elliott "did not use any substantial portion of the investors' money for spread trading; nor did he prioritize profits to investors ahead of fees or commissions to himself or funds; and there were . . . no safeguard procedures of the kind set forth in Piptastic's investment agreements[.]"  Id. ¶ 27.  Instead of using investor funds for spread-trading, Elliott transferred $6,985,217 in investor funds from the pooled Piptastic bank account to himself, an entity that he controlled called DSE, his wife, Relief Defendant Paul Rose, an entity controlled by Rose called Unique Asset Management, and other third parties, all of whom lacked any legitimate right to the funds.  Id.

In response to questions from investors about the status of their money, Elliott fabricated account statements, assured investors that the funds were secure, and diverted investors' funds to pay other investors.  Id. ¶¶ 31-38.  Elliott also falsely informed investors seeking to withdraw their funds that he was barred from doing so due to an "account freeze."  Id. ¶ 36.

---

[1] Spread trading "refers to speculating on whether the price of a financial instrument—such as a security; or a commodity, such as a currency—will go up or down, and by how much, without actually owning the underlying security or commodity."  Doc. No. 1 ¶ 1.

II.     MOTION FOR REMEDIES

The SEC filed the present Motion for Remedies requesting that the Court order Elliott to pay disgorgement of $5,492,059 in ill-gotten gains plus $856,255 of prejudgment interest, and a "significant" (but unspecified) civil penalty.  Doc. No. 68 at 1.

The SEC's disgorgement and prejudgment interest calculations are supported by a Declaration from Mark Albers, a forensic accountant employed by the SEC.  See Doc. No. 69. Albers calculated the disgorgement amount by subtracting the amount of money returned to Piptastic's investors from the amount of money initially deposited by investors in order to arrive at the amount of money retained by the Defendants.  See id. ¶¶ 5-14 (explaining Albers' analysis).  Albers then applied an exchange rate to convert the calculation from British pounds to dollars and performed a prejudgment interest calculation on the net disgorgement numbers.  Id. ¶¶ 9-10.  The SEC contends that Elliott is jointly and severally liable for the disgorgement attributable to Piptastic, DSE, and Elliott's wife, resulting in a total disgorgement amount of $5,492,059 plus $856,255 of prejudgment interest.  In arguing for joint and several liability, the SEC points out that Elliot was the sole director of Piptastic and DSE and that he maintained signatory authority over Piptastic's bank account.  See Doc. No. 69 ¶ 5.  In addition to the aforementioned disgorgement and prejudgment interest amounts, SEC requests that the Court impose the maximum available civil penalty against Elliott.  Doc. No. 68 at 9.

In his opposition to the SEC's Motion, Elliott does not dispute that he owes disgorgement and a civil penalty but takes issue with two aspects of the SEC's request.  Specifically, Elliott contends that he cannot be held liable on a joint and several basis with DSE and Piptastic, and

4

that SEC's request for a maximum-tier civil penalty is unsupported by law. The Court addresses each of Elliott's objections in turn.

### A.  Joint and Several Liability

Elliott contends that the Supreme Court's recent decision Liu v. SEC curtails courts' ability to order disgorgement on a joint and several basis. According to Elliott, he cannot be held jointly and severally liable with Piptastic and DSE absent evidence that the disgorgement amounts attributable to these entities "also accrued to Elliott." Doc. No. 72 at 5. Elliott also argues that he cannot be held jointly and severally liable with Piptastic and DSE because they have been dissolved. Id. at 6. Elliott's arguments fail as explained below.

"Disgorgement serves both to ensure that the perpetuator of a fraud is not unjustly enriched by the fraudulent act and to deter potential violators." SEC v. Locke Cap. Mgmt., Inc., 794 F. Supp. 2d 355, 369 (D.R.I. 2011). The Supreme Court's recent holding in Liu v. SEC confirmed that district courts possess authority to order disgorgement in Commission cases. The Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible" under §78u(d)(5) [Section 21(d)(5) of the Securities Exchange Act]. Liu v. SEC, 140 S. Ct. 1936, 1940 (2020). The Court has broad discretion to determine the proper disgorgement amount, which "need only be a reasonable approximation of profits causally connected to the violation." SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004); see also SEC v. Navellier & Assocs., Inc., No. 17-CV-11633-DJC, 2021 WL 5072975, at *1 (D. Mass. Sept. 21, 2021).

Contrary to Elliott's assertions, Liu does not foreclose joint and several liability in this case. Liu expressly noted that "common law did . . . permit liability for partners engaged in concerted wrongdoing." Liu, 140 S. Ct. at 1949. Liu urged lower courts to consider the

appropriateness of joint and several liability by assessing such factors as whether one partner "was a mere passive recipient of profits," if the partners commingled funds, and whether one partner "did not enjoy the fruits of the scheme." Id. Courts both before and after Liu have ordered "an owner-officer and a company [to] pay disgorgement on a joint and several basis." Navellier & Assocs., Inc., 2021 WL 5072975, at *2-*3 (holding an entity and the entity's Chief Investment Officer and Chief Executive Officer jointly and severally liable for disgorgement); see also SEC v. Esposito, et al., Civ. No. 16-cv-10960-ADB, 2018 WL 2012688, *9 (D. Mass. April 30, 2018) (holding managing director and entity jointly and severally liable for disgorgement); SEC v. Locke Capital Mgmt., Inc., 794 F. Supp. 2d 355, 369 (D.R.I. 2011) (holding entity and entity's sole owner jointly and severally liable for disgorgement); SEC v. Owings Grp., LLC, No. CV RDB-18-2046, 2021 WL 1909606, at *4 (D. Md. May 12, 2021) ("Liu's holding did not eliminate a court's authority to order disgorgement in a joint and several manner. Both prior to and after Liu, this Court and other District Courts have consistently ordered a person who controls an entity to disgorge the illegitimate funds received by that entity.").

Here, joint and several liability is appropriate because Elliott, Piptastic, and DSE were engaged in concerted wrongdoing. Elliott was the sole director of both entities and had signatory authority over the pooled Piptastic investor bank account. The allegations of the complaint, which the Court accepts as true, establish that Elliott freely transferred funds from the Piptastic account to his own account, as well as DSE's and those of third parties. Doc. No. 1 ¶ 27. Finally, the dissolution of Piptastic and DSE has no bearing on the joint and several liability inquiry as Elliott contends. See SEC v. Spencer Pharm. Inc., No. 12-CV-12334-IT, 2015 WL 5749436, at *6 (D. Mass. Sept. 30, 2015) (ordering disgorgement on a joint and several basis

6

against a "defunct" company). Accordingly, the Court orders Elliott to pay disgorgement of $5,492,059 in ill-gotten gains plus $856,255 of prejudgment interest.

### B. Civil Penalties

The SEC also requests that the Court impose civil penalties against Elliott. Though the SEC seeks the "maximum" penalties available under the Exchange Act and the Securities Act, it neither specifies an amount nor a process for calculating such penalties. For his part, Elliott contends that a maximum penalty is inappropriate in these circumstances given, inter alia, his acceptance of responsibility, financial condition, and the isolated nature of his violations. As explained in detail below, the Court orders a civil penalty in the amount of $97,523 against Elliott.

Both the Securities Act and the Exchange Act permit the Court to impose a civil penalty determined based on the facts and circumstances of the case. 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A). "Civil penalties serve a dual purpose: to punish the wrongdoer and to deter future violators." Locke Cap. Mgmt., Inc., 794 F. Supp. 2d at 370. Under both Acts, courts determine the penalty according to a three-tier scheme. "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court." SEC v. Lemelson, No. CV 18-11926-PBS, 2022 WL 952264, at *4 (D. Mass. Mar. 30, 2022) (quoting SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005)). Tier II requires that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). In addition to the fraud elements of Tier II, Tier III requires a showing that "such violation directly or indirectly resulted in substantial losses or created a significant

risk of substantial losses to other persons." Id.  Under each tier, the penalty cannot exceed the greater of a specified amount per violation or the defendant's gross pecuniary gain.  Id.

In assessing the appropriate penalty, courts consider "the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation with authorities or lack thereof, and the defendant's current financial condition."  Esposito, 2018 WL 2012688, at *9.

Here, the SEC seeks the maximum-tier civil penalty.  For a third-tier violation, the court may impose a sanction up to the greater of $195,047 per violation or the gross pecuniary gain. Doc. No. 68 at 10-11.  A second-tier violation carries a sanction up to the greater of $97,523 or the gross pecuniary gain.  Id.  Though the language of the statutes allows courts to calculate the sanction on a per-violation basis, other courts have imposed a single penalty where, as here, the "defendant has violated a number of securities laws in carrying out a single scheme."  Locke Cap. Mgmt., Inc., 794 F. Supp. 2d at 370.

The complaint details a sophisticated scheme that lasted a number of years and risked the investments of numerous investors.  However, there are countervailing facts including Elliot's acceptance of responsibility in this litigation and his financial condition, which is not challenged by the SEC.  The seriousness of Elliott's conduct is therefore tempered by additional factors and his later actions in the course of this litigation.  Elliott agreed to the final judgment and acknowledged that sanctions were warranted.  The Court also takes note of Elliott's lack of

financial resources. In light of these factors, the Court finds that a single, second-tier penalty of $97,523 (rather than Elliott's gross pecuniary gain) is appropriate.

III.    MOTION TO AMEND FINAL JUDGMENT AS TO PIPTASTIC LIMITED

Finally, the SEC seeks to amend the final judgment entered against Piptastic, Doc. No. 60, to correct an error in the calculation of the disgorgement amount attributable to Piptastic. See Doc. No. 67 at 2 (explaining the error). The SEC's Motion to Amend is ALLOWED. The Clerk shall correct the error in the judgment.

IV.    CONCLUSION

For the reasons stated herein the Court ALLOWS the SEC's Motion for Remedies (Doc. No. 67) and orders Elliott to pay $5,492,059 in disgorgement, $856,255 in prejudgment interest, and a civil penalty of $97,523. Separate judgment shall issue. The Clerk shall also correct the error in the Piptastic judgment. The SEC shall file a status report updating the Court on the remaining issues in this case within seven days.

SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge